IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Civil Action No.: 1:19-cv-343

| | |
|---|---|
| BRENT S. WHITESIDES, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> AALLIED DIE CASTING COMPANY ) <br> OF NORTH CAROLINA; and, ) <br> AALLIED DIE CASTING AND ) <br> MANUFACTURING CO., INC. ) <br> ) <br> Defendant. ) | **COMPLAINT** <br> **Jury Trial Demanded** |

The plaintiff, complaining of the Defendant, alleges and says:

## I. INTRODUCTION AND JURISDICTION

1. This is an action seeking legal and equitable relief under Title VII of the Civil Rights Act of 1964, et seq. ("Title VII"), and 42 U.S.C. § 1981 ("§ 1981").

2. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1343, this being a proceeding to enforce rights and remedies secured under Title VII. Jurisdiction is also conferred upon this Court by 42 U.S.C. § 2000(3), et seq. and 28 U.S.C. § 1331.

3. Jurisdiction is further invoked pursuant to 28 U.S.C. §§ 2201 and 2202, this being an action for declaratory judgment declaring illegal the act of defendant complained of herein which violated rights secured to the plaintiff by Title VII and 42 U.S.C § 1981.

## II. PARTIES

4. Plaintiff is an African-American male citizen residing in Rutherfordton, Rutherford County, North Carolina.

5. Defendant Aallied Die Casting Company of North Carolina is a company during business in Rutherford County, North Carolina. It is an employer within the meaning of Title VII and § 1981.

## III. FACTS

6. Plaintiff initially was employed with Defendant as a general laborer as a temporary employee. He was thereafter offered a position as Quality Inspector with Defendant. Plaintiff has worked primarily on the third shift where his third-shift production supervisor was Robert Shoop, white male. On numerous occasions, Robert Shoop made condescending and racially offensive and stereotypical remarks to Plaintiff suggesting that Plaintiff was on drugs, made comments about "the hood and the ghetto" and constantly followed him, glared at him and on occasions made sudden threatening, physical moves toward him. Shoop, told another white employee not to associate with Plaintiff and pointed at veins on his arms to suggest that Plaintiff was using drugs. He also encouraged other workers to ridicule the Plaintiff in an attempt to intimidate him. He made bogus reports of inadequate performance regarding Plaintiff. His inappropriate behavior continued in the form of saying "Brent ain't worth a fuck". At payroll distribution in March 2018, in handing out all of the checks, Shoop pretended to search and not find one for Plaintiff but finally handed him one saying "you ain't quit yet".

7. The harassment that Plaintiff endured at the hands of his supervisor was reported to the Quality Manager and to HR repeatedly. Nothing was done by either to address the problem.

8. Plaintiff was initially hired on a 90-day probation but was offered full time position within 70 days due to his willingness to work hard and to assist whenever possible.

9. When a quality position became available, Plaintiff applied for and had an interview for the position. He let Jeff McEntyre, white male, know that he had a Bachelor's Degree and was willing to go above and beyond in order to move up within the company. Plaintiff was not hired for the position but a white female was hired off the street with no college education or experience. She was later fired. Only after that woman was fired was Plaintiff offered the quality inspector position. Within a week of working as a quality inspector, Plaintiff learned that a white male quality inspector was making between $4.00 to $5.00 more per hour than the African-American quality inspectors, who had four to fifteen years of experience in the position. Plaintiff approached Jeff McEntyre about the difference in pay. McEntyre told him that the white inspector was "trying to be something in the company."

10. Plaintiff sought to advance himself in the company and asked to take the training or the test to be certified as a quality inspector. Initially, McEntyre told him that it might be too stressful for him to be learning a new job and taking a test. Plaintiff waited a month and then went back to McEntyre and told him that he wanted to take the certified test. Plaintiff was told by McEntyre that he would have to sign a contract agreeing to work for the company for x-amount of time and that he would get back to the Plaintiff. Some time passed and McEntyre had not gotten back to the Plaintiff. Plaintiff then went to McEntyre's office to ask for additional training and to take the certified quality inspector test. At that point, McEntyre told Plaintiff that if he wanted to take the certified quality inspector test that he would have to pay for it out of his pocket. Plaintiff is aware that white certified quality inspectors who have taken the test had that test paid for by the company.

11. After being with the company for one full year, Plaintiff sent McEntyre a text message telling him that he had been with the company for one year and that he would like to

3

take the test to become a certified quality inspector. McEntyre ignored the Plaintiff's text and responded some five days later telling him that he was needed in the office. Plaintiff went to his office thinking that he was going to receive information about taking the test but instead he was told by Jeff that he had been receiving complaints about him from Shoop.

12. On January 12, 2018, McEntyre sent Plaintiff a text telling him that he was confused about the production manager's comment that Plaintiff wanted to get more training. Plaintiff reminded him of his previous text messages and sent him screen shots of the text messages where he had asked for training. Eleven days later, McEntyre responded stating that he had not been able to send messages. However, McEntyre had been able to send messages because he has sent them to Plaintiff and others on group text.

13. A higher position became available in the quality department for which Plaintiff had initially expressed an interest but was denied. The person occupying the position quit and McEntyre sought to put another quality inspector in that position but she did not want it. Plaintiff was the only quality inspector who wanted to take on the new job. The job was not filled for over a month and a half. McEntyre then called Plaintiff to his office to ask if he was interested in the position. Plaintiff told him yes. Later, a white male who had only been in the plant for about two weeks and who had no knowledge of the parts or anything about quality was brought in to take the position.

14. On or about March 1, 2018, McEntyre called Plaintiff into his office and told him that upper management had the feeling that Plaintiff was fed up with the way that he was being treated. He told Plaintiff, who holds a four-year degree, that there were no position for Sociology degrees at the company. Plaintiff advised him that it did not matter what his degree

4

was in that the degree showed that he could start and complete something. The white male who was hired had no degree at all.

15. On or about March 2018, he advised Plaintiff that when Plaintiff and another employee, Daryl Dato, met with him about the harassing behavior to which Plaintiff had been subjected and that "Plaintiff should not let the supervisor get to him, to ignore him and to just walk away."

16. Plaintiff was discharged from his position allegedly for sleeping on the job. Plaintiff denies that he was sleeping on the job. Plaintiff is aware that management was aware of a white male sleeping on the job on more than one occasion but that employee was not discharged and at best was given a verbal warning. Plaintiff had not received any warnings regarding misconduct before being discharged from his employment.

17. Defendant's harassing behavior and its failure to correct that behavior caused Plaintiff to experience health issues which required medical attention. That medical attention included the prescription for medication for anxiety and distress.

## IV. CLAIMS FOR RELIEF

### First Cause of Action – Race Discrimination

18. Plaintiff realleges paragraphs 1 – 17 above.

19. Defendant discriminated against Plaintiff when it failed to provide him with training to become a certified quality inspector and by insisting that if he took the course and test that he would have to pay for it out of his pocket while the company had provided similar training at no cost to white quality inspectors.

20. Defendant discriminated against Plaintiff on the basis of his race when it paid a white quality inspector with less time and experience than Plaintiff more money than Plaintiff

5

and the other African-American quality inspectors even though they were doing the same work. Defendant discriminated against Plaintiff on the basis of his race when it terminated him for allegedly sleeping on the job while a similarly situated white man slept on the job and his sleeping on the job was known to management.

21. The actions of the Defendant complained of herein violate Title VII of the Civil Rights Act of 1964 and § 1981 of the Civil Rights Act of 1866.

22. Defendant's actions have caused Plaintiff economic harm and emotional distress.

## Second Cause of Action – Hostile Work Environment

23. Plaintiff realleges paragraphs 1 – 22 above and incorporates them herein.

24. Defendant subjected the Plaintiff to a racially hostile work environment when his supervisor repeatedly subjected him to racially disparaging comments. Defendant was made aware of this behavior but failed to take any action to prevent the reoccurrence.

25. Defendant's actions complained of herein violate Title VII of the Civil Rights Act of 1964 and § 1981 of the Civil Rights Act of 1866.

26. As a result of Defendant's actions, Plaintiff has suffered economic harm and emotional distress.

## Third Cause of Action – Retaliation

27. Plaintiff realleges paragraphs 1 – 26 above and incorporates them herein.

28. Defendant retaliated against Plaintiff by terminating him from his employment on June 20, 2018. Prior to his discharge, Plaintiff had made repeated complaints of discrimination to the Human Resources Department, the last of which was in March 2018. Plaintiff complained about the constant behavior of his supervisor making disparaging remarks and intimidating and

bullying him. Plaintiff had also complained to the quality manager about his supervisor's behavior. Plaintiff's protected activity was causally related to the termination.

29. Plaintiff is aware that management knew or should have known that persons other than the Plaintiff supposedly were sleeping while employed on the job. Those persons, to Plaintiff's knowledge, had not engaged in any protected activity such as have Plaintiff.

30. Defendant's actions complained of herein violate Title VII of the Civil Rights Act of 1964 and § 1981 of the Civil Rights Act of 1866.

31. As a result of Defendant's actions, Plaintiff has suffered economic and emotional distress.

## V. EXHAUSTION OF REMEDIES

32. Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission, Charge No. 430-2019-00532, dated December 4, 2018. The EEOC issued a Notice of Right-to-Sue on September 11, 2019 which was received on September 16, 2019. Plaintiff is filing this lawsuit within 90 days of the receipt of the EEOC Notice of Right-to-Sue letter.

## VI. JURY TRIAL DEMANDED

33. Plaintiff hereby demands a trial by jury.

## VII. PRAYER FOR RELIEF

34. Wherefore, plaintiff prays that the discrimination alleged herein be remedied in full and that the Court, after a jury trial:

> (1) Declare the actions complained of herein to be illegal;
>
> (2) Issue an injunction enjoining defendant, its agents, its employees, successors, attorneys and those acting in concert or participation with defendant

and at its direction, from engaging in the unlawful practices set forth herein and any other employment practice to be shown in violation of Title VII of the Civil Rights Action of 1964 and 42 U.S.C., § 1981;

(3) Award plaintiff compensatory damages, including damages for mental anguish and stress, and harm to plaintiff's career opportunities;

(4) Award plaintiff back pay and all other economic damages to provide make whole relief;

(5) Award plaintiff his costs and expenses in this action, including reasonable attorney's fees, costs and other litigation expenses;

(6) Grant such other and further relief as may be just and necessary to afford complete relief to plaintiff.

This 12th day of December, 2019.

*/s/Geraldine Sumter*
GERALDINE SUMTER
N.C. Bar No. 11107
Ferguson Chambers & Sumter, PA
309 East Morehead Street, Suite 110
Charlotte, North Carolina 28202
Telephone: (704) 375-8461
Facsimile: (980) 938-4867
E-Mail: gsumter@fergusonsumter.com

*Attorney for Plaintiff*